# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# EASTERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

QUANTEZ CRIBBS,

    Defendant.

No. 8-CR-1320-CJW

**MEMORANDUM OPINION AND ORDER**

_____

This matter is before the Court on defendant Quantez Cribbs' motion for compassionate release based on the ongoing COVID-19 pandemic. (Doc. 108).

## I. BACKGROUND

On May 20, 2009, the Court sentenced defendant to 278 months' incarceration, with eight years of supervised release to follow, on one count of possession and aiding and abetting the possession with intent to distribute cocaine base within 1,000 feet of a protected area after a prior felony drug conviction. (Doc. 38). On January 2, 2019, defendant filed a pro se motion to reduce his sentence under the First Step Act ("FSA"). (Doc. 74). On June 5, 2020, this Court denied that motion. (Doc. 92). Defendant timely appealed that ruling. (Doc. 95). On June 22, 2020, defendant filed a pro se motion for compassionate release with this Court. (Doc. 99). On July 29, 2020, the Court appointed counsel for defendant. (Doc. 101). On August 24, 2020, defendant filed the instant motion and accompanying brief. (Docs. 108, 109). On September 4, 2020, the government timely filed its resistance. (Doc. 112). Defendant is currently

incarcerated at the Federal Medical Center ("FMC") in Rochester, Minnesota, with an estimated release date of October 29, 2028.[1]

In his motion, defendant, who is 51 years old, asks to be granted compassionate release due to the COVID-19 pandemic and his health issues. (Doc. 109, at 112). Defendant appealed his prior motion under the FSA, however, and that appeal is still pending with the Eight Circuit Court of Appeals. (Doc. 95). Accordingly, because the Court lacks authority to grant the motion, the Court will treat defendant's motion as requesting an indicative ruling under Federal Rule of Criminal Procedure 37(a).[2] Under Rule 37(a), a district court may issue an indictive ruling deferring considering a motion, denying the motion, or stating it would grant the motion. Both parties to this case concur that an indicative ruling is the appropriate course of action. (Docs. 109, at 6–7; 112, at 8–11).

## II. COMPASSIONATE RELEASE

A court's ability to modify a sentence after it has been imposed is limited. Title 18, United States Code, Section 3582(c)(1)(A) allows a court to modify a sentence through "compassionate release." A defendant may directly petition the court for compassionate release "after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A). The court may only reduce

---

[1] *Bureau of Prisons: Inmate Locator*, https://www.bop.gov/inmateloc/.

[2] In a previous case where the applicability of Rule 37 to compassionate release was at issue, the government filed a response stating, "[c]ourts have regularly found that [Rule 37] applies to compassionate release motions and permits district courts to do any of the three options presented in the rule." *United States v. Noye*, 19-CR-0078 CJW, Doc. 63 at 11, citing *United States v. Campbell*, Case No. 06-CR-06105, 2020 WL 1958486, at *2 (W.D.N.Y. Apr. 21, 2020).

2

the defendant's sentence, however, after considering the factors set forth in Title 18, United States Code, Section 3553(a) to the extent they are applicable, and finding that:

> (i) extraordinary and compelling reasons warrant such a reduction; or
>
> (ii) the defendant is at least 70 years of age, has served at least 30 years in prison, pursuant to a sentence imposed under section 3559(c), for the offense or offenses for which the defendant is currently imprisoned, and a determination has been made by the Director of the Bureau of Prisons that the defendant is not a danger to the safety of any other person or the community, as provided under section 3142(g);
>
> and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A). Defendants bear the burden of establishing eligibility for a sentence reduction. *United States v. Jones*, 836 F.3d 896, 899 (8th Cir. 2016).

The starting point in determining what constitutes "extraordinary and compelling reasons" under Section 3582(c)(1)(A)(i) is the United States Sentencing Guidelines ("USSG") section on compassionate release. *See* USSG §1B1.13; *see also United States v. Rivernider*, No. 3:10-cr-222(RNC), 2019 WL 3816671, at *1–2 (D. Conn. Aug. 14, 2019). The policy statement contained in USSG Section 1B1.13 states that extraordinary and compelling reasons exist under several circumstances, including when the defendant is: (1) suffering from a terminal illness; (2) suffering from a serious physical or medical condition, a functional or cognitive impairment, or physical or mental deterioration due to aging which substantially diminishes the defendant's ability to care for themselves within the facility and from which the defendant is not expected to recover; (3) at least 65 years old, is experiencing serious deterioration because of age, and has served at least 10 years or 75 percent of their sentence; (4) experiencing a change in family circumstances, namely the death or incapacitation of the caregiver of the defendant's

3

minor child or the incapacitation of the defendant's spouse who now requires the defendant's care; or (5) some other extraordinary and compelling reason as determined by the Director of the Bureau of Prisons ("BOP").

Courts are split on whether the policy statement is binding because it predates the First Step Act of 2018's changes to Section 3582(c)(1)(A). *Compare United States v. Lynn*, No. 89-0072-WS, 2019 WL 3805349, at *4 (S.D. Ala. Aug. 13, 2019), *with United States v. Urkevich*, 8:03CR37, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019). This Court has found that USSG Section 1B1.13, although a helpful guidepost, does not restrain a court's assessment of whether extraordinary and compelling reasons exist to release a defendant. *See United States v. Burnside*, No. 6:18-CR-2068-CJW-MAR, 2020 WL 3443944, at *3–4 (N.D. Iowa June 18, 2020) (compiling cases).

Thus, in order to qualify for compassionate release a defendant 1) must fully exhaust administrative remedies, 2) must demonstrate to the court that "extraordinary and compelling reasons warrant such a reduction", and 3) must otherwise warrant a reduction in sentence considering the factors set forth in Section 3553(a), to the extent they are applicable.

### A. *Exhaustion of Administrative Remedies*

Title 18, United States Code, Section 3582(c)(1)(A) states that a court may consider reducing a term of imprisonment after the defendant exhausts all administrative remedies within the BOP or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]" This Court has found that defendants are not required to administratively appeal a warden's denial and may instead fulfill Section 3582(c)(1)(A)'s exhaustion requirement by waiting 30 days from the date the warden receives their request before filing a motion in the courts. *See Burnside*, 2020 WL 3443944, at *4–7.

4

On April 10, 2020, defendant formally petitioned prison officials at FMC Rochester for compassionate release. (Doc. 113, at 1). On May 28, 2020, defendant requested an update from prison officials regarding his request. On June 6, 2020, prison officials responded and informed defendant that the processing of requests for compassionate release were taking longer than 30 days "[d]ue to modified operations and the massive influx" of requests. (Doc. 99, at 15). On June 15, 2020, the Warden of FMC Rochester denied defendant's request. (Doc. 113, at 2). Here, defendant has met both prongs of Section 3582(c)(1)(A), the satisfaction of either one of which triggers defendant's right to petition this Court directly.

The government argues that defendant has not exhausted his administrative remedies because his initial petition for compassionate release did not specifically cite his medical conditions as a justification for release. (Doc. 112, at 11–13). The purpose of the administrative exhaustion requirement is to afford the BOP the first opportunity to address an inmate's complaints. As the agency in closest proximity to the inmate, the BOP is in the best position to "prioritize the most urgent claims" and "investigate the gravity of the conditions supporting compassionate release and the likelihood that the conditions will persist." *United States v. Alam*, 960 F.3d 831, 836 (6th Cir. 2020). The BOP is generally much better "situated to understand an inmate's health and circumstances relative to the rest of the prison population." *United States v. Zukerman*, 451 F.Supp.3d 329, 334 (S.D. N.Y. 2020). Accordingly, the Court regularly denies without prejudice compassionate release motions that fail to afford the BOP the first opportunity to evaluate the merits of defendant's claim. Such is not the case here, however.

In his petition to the Warden, defendant did indeed neglect to cite any specific medical or COVID-related concerns in support of his claim for compassionate release. (Doc. 112-1, at 1–2). Absent any other information, defendant's failure to present this

issue to the Warden would likely have resulted in dismissal of the instant motion. In the official response to defendant denying his petition, however, the Warden described the standards by which defendant's petition was examined:

> [The]BOP Program Statement . . . provides guidance on the types of circumstances that present extraordinary or compelling reasons, such as the inmate's terminal medical condition; debilitated medical condition; status as a "new law" elderly inmate, an elderly inmate, or an "other elderly inmate"; the death or incapacitation of the family member caregiver of the inmate's child; or the incapacitation of the inmate's spouse or registered partner.

(Doc. 112-2). The Warden went on to inform defendant that his "request has been evaluated consistent with this general guidance." (*Id.*). Further, the Warden explicitly characterized defendant's petition as one "based on concerns about COVID-19." (*Id.*). Given the ubiquitous nature of the COVID-19 pandemic and the profound affect it has had on BOP policy with respect to sentence reductions it is difficult to imagine that the Warden would *not* have considered defendant's medical issues in the context of the pandemic, regardless of what defendant actually included in his petition. *See* Memorandum from Attorney General William Barr, *Prioritization of Home Confinement As Appropriate in Response to COVID-19 Pandemic* (March 26, 2020). The Court is satisfied that the Warden did in fact consider defendant's existing medical conditions, did so in the context of the COVID-19 pandemic, and therefore fulsomely considered the unique risks posed by the interplay between the disease and certain medical conditions.

The policy undergirding the administrative exhaustion requirement is to allow the BOP to address an inmate's complaints in the first instance. It appears that the BOP has done so here. An overly formalistic interpretation of this requirement—one demanding that inmates invoke specific terms or talismanic language in their petitions—does not serve this policy interest. The Court declines to interpret Section 3582(c)(1)(a) as

6

including such a requirement now. Thus, the Court finds defendant has exhausted his administrative remedies as required by Section 3582(c)(1)(a).

### B. *Extraordinary and Compelling Reason*

Defendant argues that he has an extraordinary and compelling reason for release because his medical conditions put him at a high risk of severe complications and death if exposed to COVID-19. (Doc. 109, at 11–12). In support of his argument, defendant cites his medical history of high blood pressure, prediabetes, a sickle cell-related illness, and obesity. (*Id.*). The government argues defendant's health conditions are well-controlled and do not warrant release. (Doc. 112, at 18–20).

The presence of COVID-19 at a defendant's specific facility or within the BOP generally can constitute an extraordinary and compelling reason for compassionate release if the defendant is particularly susceptible to COVID-19 due to their age or underlying health conditions. *See Burnside*, 2020 WL 3443944, at *7 (compiling cases).[3]

At 51 years old, defendant's age does not put him at extreme risk from COVID-19 infection, although the risk associated with his age is significantly higher than for younger inmates.[4] Of the medical conditions listed by defendant, only obesity is an underlying medical condition recognized by the CDC to increase a person's risk of complications from COVID-19.[5] High blood pressure and hemoglobin disorders are medical conditions which may also increase his risk. *Id.* Prediabetes is not a condition recognized by the CDC as contributing to increased risk from COVID-19 infection.

---

[3] *See also People at Increased Risk*, CDC (Sept. 11, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/index.html.

[4] *See Older Adults*, CDC (Sept. 11, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/older-adults.html.

[5] *See People with Certain Medical Conditions*, CDC (Oct. 16, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-withmedicalconditions.html.

Defendant's body mass index ("BMI") does indeed put him at increased risk of sever complications from COVID-19 infection. Defendant's medical records indicate that his BMI has fluctuated from a high of 41.2 in 2010 to a low of 38 in September 2019. (Doc. 109-1, at 131, 80). Most recently, on July 22, 2020, defendant's BMI was calculated to be 40.2. (*Id.*, at 22). Defendant's BMI places him in the highest risk category associated with weight and significantly increases his risk of severe complications from COVID-19 infection.[6] Thus, defendant's BMI is an underlying medical condition which could constitute an extraordinary and compelling reason for release.

The record regarding defendant's other medical conditions is inconsistent and sometimes contradictory. For example, defendant's brief and supporting records variously refer to his "sickle cell anemia", "sickle-cell thalassemia without crisis", and "sickle cell-related illness." On the other hand, one portion of defendant's medical record states that defendant has a history of sickle cell anemia (Doc. 109-1, at 108), while another portion states that defendant carries sickle cell trait but is not afflicted by the disease itself. (*Id.*, at 105). It is unclear what specific condition defendant suffers from, but it is clear that defendant has some form of hemoglobin disorder. The CDC recognizes sickle cell disease as an underlying medical condition which increases the risk of complications from COVID-19 and cautions that other hemoglobin disorders may increase a person's risk of complications.[7] In either event, the Court recognizes that defendant bears some level of heightened risk due to his disorder. This condition—taken

---

[6] *See CDC: Obesity Worsens Outcomes from COVID-19*, https://www.cdc.gov/obesity/data/obesity-and-covid-19.html.

[7] *See People with Certain Medical Conditions*, CDC (Sept. 11, 2020) https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#hemoglobin-disorders.

by itself—would likely not rise to the level necessary to be considered extraordinary or compelling without more definitive medical documentation. Nevertheless, considered in combination with defendant's age and obesity, as it must be, defendant's hemoglobin disorder supports the conclusion that extraordinary and compelling reasons for release exist. *See United States v. Thompson*, No. 92-30065-001, 2020 WL 3470300, at * 3 (C.D. Ill. June 25, 2020).

Similarly, the record is spotty in its support of defendant's stated history of high blood pressure. According to the CDC, people suffering from hypertension might be at an increased risk of severe illness if they contract COVID-19.[8] Defendant has not been formally diagnosed with hypertension, however. Rather, defendant has registered a number of high blood pressure readings in the past and asserts that this may indicate that defendant is suffering from essential hypertension. (Doc. 109, at 15). Indeed, defendant's medical records reflect that defendant has had blood pressure readings in the past (Doc. 109-1, at 114–15) which are fairly consistently at levels which are considered elevated or high.[9] The Court is not in a position to extrapolate what these readings may portend should defendant contract COVID-19. The Court simply cannot infer the existence of a complicating medical condition absent a formal diagnosis. Defendant's consistently high blood pressure readings do provide some support for the existence of extraordinary and compelling circumstances, but do not by themselves constitute an underlying medical condition which would warrant release.

Finally, defendant cites "prediabetes" as a medical condition which contributes to

---

[8] *See People with Certain Medical Conditions*, CDC (Sept. 11, 2020) https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html#serious-heart-conditions.

[9] *See Reading the New Blood Pressure Guidelines*, Harvard Men's Health Watch, Harvard Medical School (June 1, 2020), https://www.health.harvard.edu/heart-health/reading-the-new-blood-pressure-guidelines.

9

defendant's heightened risk of severe complications from COVID-19. (Doc. 109, at 14). Defendant concedes that prediabetes is not a condition recognized by the CDC as increasing a person's risk of complications from COVID-19. Type II diabetes is such a condition, however, and defendant urges the Court to consider defendant's prediabetes as evidence of his heightened risk of contracting Type II diabetes. (*Id.*). Again, the Court declines to draw any inferences between defendant's stated health conditions and how they may relate to complicating medical conditions enumerated by the CDC. As with defendant's blood pressure, the defendant's prediabetes is evidence of his general poor health and provides some support to the existence of extraordinary and compelling circumstances but does not stand on its own as an underlying medical condition warranting early release.

Defendant's medical conditions alone—taken individually or collectively—would not normally constitute an extraordinary and compelling reason sufficient to justify compassionate release. As the government notes, defendant's conditions are well controlled in the prison environment and defendant has not argued otherwise. (Doc. 112, at 20). The government correctly points out that under normal circumstances, "[c]hronic conditions that can be managed in prison are not a sufficient basis for compassionate release." (*Id.*) (citing *United States v. Weidenhamer*, No. CR-16-01072-001-PHX-ROS, 2019 WL 6050264, at *5 (D. Ariz. Nov. 8 2019)). The coronavirus pandemic and the prevalence of COVID-19 throughout the BOP changes that calculus somewhat, however. Defendant's BMI alone places him at elevated risk for severe complications should he contract COVID-19. When coupled with his age, hemoglobin disorder, and overall poor health, it is clear that defendant is especially vulnerable to the disease. Thus, in light of the pandemic, the Court finds that defendant's medical conditions do constitute an extraordinary and compelling reason justifying release.

### C. *Section 3553(a) Factors*

Defendant has established that an extraordinary and compelling reason exists justifying his release under Section 3582(c)(1)(A)(i). The Court's inquiry does not end there, however. Guideline Section 1B1.13(2) provides compassionate release is appropriate only when "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)[.]" Also, Section 3582(c)(1)(A) requires a court to consider the factors in Title 18, United States Code, Section 3553(a) before granting compassionate release. Section 3553(a) requires the Court to consider: (1) "the nature and circumstances of the offense and the history and characteristics of the defendant;" (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and provide rehabilitative opportunities and care to the defendant; (3) the kinds of sentences available; (4) the sentencing range set by the USSG; (5) any pertinent policy by the United States Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities among similarly situated defendants; and (7) the need for restitution to any victims. 18 U.S.C. § 3553(a)(1)–(7).

The nature of defendant's offense is very serious. In January 2008, defendant was arrested for possession of cocaine base with intent to distribute. (Doc. 31, at 8). A subsequent search of defendant's residence uncovered a substantial amount of cocaine base as well as a digital scale and clear plastic baggies with corners torn from some of them. (*Id.*). During the investigation that followed, officers learned that over the course of the preceding nine months, defendant was responsible for the purchase and distribution of over a kilogram of cocaine and cocaine base. (*Id.*, at 10). Defendant operated his distribution scheme from his residence, which was located within 1,000 feet of a local park. (*Id.*, at 8). Defendant points out that his offense did not involve a firearm or violence in any way and that he was largely cooperative with police during the investigation. (Doc. 109, at 18). This may be true, but it does nothing to ameliorate the

profoundly destructive societal effects wrought by conduct such as that defendant committed.

More troubling than defendant's conduct during the instant offense is his criminal history. At age eighteen, defendant was convicted of burglary. (Doc. 31, at 15). Defendant violated the terms of his probation for that offense numerous times, fleeing officers on foot in one instance. (*Id.*). His probation was eventually terminated unsatisfactorily. (*Id.*). This offense and defendant's conduct subsequent to his arrest marks the beginning of a decades-long pattern of recidivism and lack of respect for the law which only ended with defendant's current term of incarceration.

At age nineteen, while still on probation for the above-noted offense, police found defendant in possession of 65 individually packaged sachets of cocaine. (*Id.*, at 16). At age twenty, while still on probation for his burglary conviction and while disposition of his previous drug arrest was pending, defendant was again arrested for distributing cocaine. (*Id.*, at 17–18). This time, defendant attempted to dispose of evidence and fled officers on foot. (*Id.*). At age 22, while on parole for his prior drug offenses, defendant was again arrested for distributing controlled substances. (*Id.*, at 19). After being released on bond pending resolution of these matters by the Circuit Court of Cook County, Illinois, defendant fled the jurisdiction.

At age 23, defendant was arrested in Dubuque, Iowa, on the warrant issued for his non-appearance in Illinois. (*Id.*, at 20). While being detained at the Dubuque County Jail pending extradition to Illinois, defendant continued to operate his drug distribution scheme. (*Id.*). Using the jail house telephone, defendant issued orders for other individuals to transport drugs from Chicago to Dubuque and to distribute them on his behalf. (*Id.*). This conduct resulted in defendant being charged with felony conspiracy to deliver a controlled substance. After his transfer to the Illinois Department of Corrections, defendant was charged with multiple offenses stemming from his criminal

activity in Dubuque. These charges included delivery of a counterfeit substance within 1,000 feet of a school, three counts of delivery of a controlled substance, and two counts delivery of a controlled substance within 1,000 feet of a school. (*Id.*, at 24–47). As a consequence of his myriad criminal charges in Illinois and Iowa, defendant was incarcerated until May, 2000.

Upon his release from prison, defendant violated the terms of his parole several times. Defendant physically assaulted a woman and threatened to kill her, failed to attend substance abuse treatment, failed to maintain employment, violated curfew, and failed to maintain contact with his parole officer. (*Id.*, at 22). Defendant was charged with domestic abuse in 2002, was twice arrested for violating a no contact order associated with that charge, and twice failed to complete the Batterer's Education Program ordered by the court in association with that charge. (*Id.*, at 48–50). Defendant's parole was eventually revoked and he returned to the custody of the Iowa Department of Corrections.

Prior to his arrest for the instant offense, defendant also incurred numerous driving violations, including a charge for reckless driving in 2004, driving under suspension in 2005 and twice more in 2006, and driving while barred in 2007. (*Id.*, 50–53).

Nothing in defendant's criminal history leads this Court to believe that he would not continue to be a danger to the community should he be released. Defendant's past crimes of violence and his numerous drug distribution convictions demonstrate how little he regards the safety of those around him. The sheer volume of convictions he incurred while on probation, parole, or supervised release demonstrate his contempt for law enforcement, the courts, and the laws of society in general. Neither age nor prior punishment softened defendant's callousness towards the norms of society or deterred him from behaving in ways that were highly destructive to his community.

Defendant urges the Court to take into account the fact that the bulk of defendant's criminal charges accrued during a relatively short span of his youth. (Doc. 109, at 18).

13

Defendant points out that "after racking up an admittedly large number of offenses in a short time, [defendant] did not suffer any convictions until the age of 33." (*Id.*) The Court takes little comfort in this fact given that defendant's sudden cessation of criminal activity happened to coincide precisely with the time he spent in prison. The suggestion that defendant's criminal behavior was merely the product of his intemperate youth is belied by the fact that defendant began reoffending almost immediately after his release. In fact, the only significant periods of time in defendant's entire adult life which are not characterized by criminal conduct are those periods he has spent in prison. In short, this Court is unconvinced that defendant would not recidivate or otherwise endanger the community if released from prison.

Defendant's extensive criminal history contributed substantially to the length of his sentence for the instant offense. With twenty-one criminal history points, defendant was placed in Criminal History Category VI. (Doc. 31, at 54). As a designated career offender under USSG §4B1.1(b)(A), defendant was subject to a three-level enhancement of his offense level, making his total offense level 34. (*Id.*, at 12–13). The resulting advisory guideline range of 262–327 months is more than twice the statutorily required minimum sentence for this offense. (*See id.*, at 78). Defendant has currently served less than half of his sentence as originally imposed. This falls far short of what the Court considers sufficient to reflect the seriousness of his crime.

Defendant has shown that extraordinary and compelling reasons exists warranting his release under Title 18, United States Code, Section 3582. This showing does not overcome the need for the sentence to conform to the goals of sentencing enumerated in Section 3553(a), however. In light of the seriousness of the offense conduct, the manner in which defendant has conducted himself when released in the past, and the likelihood that defendant would continue to pose a danger to society if released, the Court finds that releasing him would not serve the interests of justice or preserve the safety of the public.

14

### *III.* CONCLUSION

For these reasons defendant's motion for compassionate release is **denied**. (Doc. 108). To the extent that the defendant's pro se motion (Doc. 99) is not superseded by the instant motion, it is also **denied**. Defendant must serve the remainder of his term of incarceration. The Clerk of Court is directed to forward a copy of this order to the Eighth Circuit Court of Appeals.

**IT IS SO ORDERED** this 3rd day of November, 2020.

_____
C.J. Williams
United States District Judge
Northern District of Iowa